## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| EVIN KING, ) | |
| ) | |
| Plaintiff, v. ) | Case No. 18-cv-02353 |
| ) | |
| CLEVELAND POLICE OFFICERS ) | |
| DENNIS GUNSCH, GREGORY KUNZ, ) | |
| THE ESTATE OF ROBERT ) | |
| MATUSZNY[1], MICHAEL O'MALLEY, ) | **Judge Dan Aaron Polster** |
| THOMAS MILLER, TIMOTHY ) | |
| ZBIKOWSKI, CITY OF CLEVELAND, a ) | |
| municipal corporation, THE ESTATE OF ) | |
| ROBERT CHALLENER, KAY MAY, and ) | |
| ELIZABETH K. BALRAJ, Cuyahoga ) | **JURY TRIAL DEMANDED** |
| County Coroner sued in her individual ) | |
| and official capacities, and CUYAHOGA ) | |
| COUNTY, ) | |
| ) | |
| Defendants. ) | |

## AMENDED COMPLAINT

Plaintiff, EVIN KING, by his attorneys LOEVY & LOEVY, complains of

Defendants CLEVELAND POLICE OFFICERS DENNIS GUNSCH, GREGORY

KUNZ, THE ESTATE OF ROBERT MATUSZNY, THOMAS MILLER, MICHAEL

O'MALLEY, TIMOTHY ZBIKOWSKI, (the Cleveland police officers identified above

will be referred to collectively as "POLICE DEFENDANTS"), CITY OF

CLEVELAND, a municipal corporation, THE ESTATE OF ROBERT CHALLENER,

KAY MAY, ELIZABETH K. BALRAJ (Defendants Challener, May, and Balraj will

be referred to collectively as "FORENSIC DEFENDANTS"), Cuyahoga County

Coroner, and CUYAHOGA COUNTY as follows:

---

[1] On February 5, 2019, at the Case Management Conference, this Court granted
Plaintiff's oral motion to substitute the Estate of Robert Matuszny for Robert
Matuszny as a party defendant and instructed Plaintiff to make the change in his
Amended Complaint.

**INTRODUCTION**

1.      Plaintiff's journey into a nightmare of injustice began with a horrible tragedy, the rape and murder of Crystal Hudson. Ms. Hudson was raped and killed at an unknown time between June 20 and 22, 1994. The crimes have never been solved.

2.      Instead of doing the work to find the real rapist/murderer, Defendants took the easier path and fabricated evidence to blame Plaintiff, whose only offense was simply being present when the body was found.

3.      Defendants further hid exculpatory evidence that Plaintiff could have used to rebut the fabricated evidence against him.

4.      At the time of her death, Plaintiff had been dating Ms. Hudson, and occasionally stayed at her house.

5.      Police Defendants immediately, unequivocally, and wrongly accused Plaintiff of the rape and murder after Ms. Hudson's body was found.

6.      Plaintiff was arrested at the scene and was imprisoned for the next 23 years of his life for crimes he did not commit.

7.      There was never any real evidence connecting Plaintiff to the rape or murder. Rather, all of the evidence against Plaintiff was fabricated to quickly "solve" the murder and never look back.

8.      In fact, at the time, DNA evidence established conclusively that Plaintiff was not the person who raped Ms. Hudson.

9.      But nothing (not even DNA evidence) would shake Defendants from their rush-to-judgment. When evidence repeatedly demonstrated that the culprit was someone else, Defendants either hid that evidence or fabricated new evidence so that crime remained "solved."

10.     Defendants had no intention of ever finding the true rapist/murderer.

Instead, they wanted to support the arrest and prosecution of Plaintiff regardless of the truth.

11.     Police Defendants fabricated and manipulated false witness accounts, including from minor children, to suggest Plaintiff's role in the murder.

12.     Forensic Defendants fabricated evidence to allow them to claim falsely that the rape did not happen contemporaneous to the murder—this was directly contrary to the physical evidence in the case and to the known science at the time. To be clear, the actual physical evidence did not remotely support Defendants' theory at the time or now.

13.     Based on the force of the fabricated evidence, Plaintiff was charged, prosecuted, and wrongly convicted of murder. He was sentenced to fifteen years to life in prison.

14.     He served 23 years imprisoned for a crime he did not commit before he was exonerated.

15.     Plaintiff now seeks justice for the harm that Defendants caused him and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

16.     This action is brought under 42 U.S.C. §§ 1983 and 1988 and Ohio law to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

17.     This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, the majority of Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

19.     Plaintiff Evin King is a 61 year-old father of three who spent over two decades of his life in prison for crimes he did not commit.

20.     Defendants Dennis Gunsch, Gregory Kunz, Robert Matuszny, Thomas Miller, Michael O'Malley, and Timothy Zbikowski ("Police Defendants") are current or former officers of the Cleveland Police Department. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and/or for supervising other Police Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case. Each is sued in his individual capacity.

21.     Defendant Challener was the Chief Deputy Coroner of the Cuyahoga County Coroner's Office. He was responsible for investigating evidence related to deaths, including the crime at issue in this case, and for supervising other staff in the Cuyahoga Coroner's office. Defendant Challener committed, facilitated, and approved the constitutional violations at issue in this case. His estate is sued in an individual capacity.

22.     Defendant Kay was a Forensic Serologist at the Cuyahoga County Coroner's Office. She was responsible for analyzing evidence related to deaths, including the crime at issue in this case. Defendant Kay committed, facilitated, and approved the constitutional violations at issue in this case. She is sued in her individual capacity.

4

23.     Defendant Elizabeth K. Balraj, in her individual and official capacities, was the elected Cuyahoga County Coroner in 1994 who oversaw the Cuyahoga County Coroner's Office.  Defendant Balraj developed forensic evidence that was improperly used to charge, prosecute, and imprison Plaintiff. In addition, Defendants Challener and May were employed by Defendant Balraj or were acting as an agent of the Cuyahoga County Coroner's Office while conducting the investigation described in this Complaint. Defendant Balraj is therefore liable for all torts committed by these Defendants under the doctrine of *respondeat superior*. Defendant Balraj is additionally responsible for the policies and practices of the Cuyahoga County Coroner's Office, which were implemented by Defendants in this case. Finally, Defendant Balraj is responsible under Ohio law for any judgment entered against Defendants. Defendant Balraj is sued in her individual and official capacities.

24.     Defendant Cuyahoga County, Ohio, is a municipality of the State of Ohio, which oversees the Cuyahoga County Coroner's Office. Defendants Challener and May were employed by Cuyahoga County or were acting as agents of Cuyahoga County and the Cuyahoga County Coroner's Office while conducting the investigation described in this Complaint. Defendant Cuyahoga County is therefore liable for all torts committed by these Defendants under the doctrine of *respondeat superior*. Defendant Cuyahoga County is additionally responsible for the policies and practices of the Cuyahoga County Coroner's Office, which were implemented by Defendants in this case. Finally, Defendant Cuyahoga County is responsible under Ohio law for any judgment entered against Defendants.

25.     Defendant City of Cleveland is a municipality of the State of Ohio, which oversees the Cleveland Police Department. Each of the Police Defendants

referenced above was employed by the City of Cleveland or was acting as an agent of the City of Cleveland and the Cleveland Police Department while conducting the investigation described in this Complaint. Defendant City of Cleveland is therefore liable for all torts committed by these Defendants pursuant to the doctrine of *respondeat superior*. Defendant City of Cleveland is additionally responsible for the policies and practices of the Cleveland Police Department, which were implemented by Defendants in this case. Finally, Defendant City of Cleveland is responsible under Ohio law for any judgment entered against Defendants.

26.     At all times relevant to the events described in this Complaint, each of the individual named Defendants acted under color of law, within the scope of his/her employment, and as an investigator. Each of the individually-named Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The Rape and Murder of Crystal Hudson

27.     Crystal Hudson was raped and murdered sometime between the evening of June 20 to the morning of June 22, 1994. Her naked body was hidden in a closet in her apartment.

28.     Ms. Hudson's body showed physical injuries to her rectum, including hemorrhaging, consistent with an anal rape. These are not injuries that one would expect a person to endure without notice.  This demonstrated that the rape and murder occurred as one incident.

29.     Moreover, physical evidence demonstrated that Ms. Hudson had been hit and scraped on the head and about her body when she was murdered. The physical evidence also revealed that those injuries happened simultaneously with her being strangled and that this all happened while she was naked. This further

6

demonstrates that the rape and murder occurred in once incident.

30.     Rectal and vaginal smears revealed the presence of sperm, with most of the sperm found from the rectum, also consistent with an anal rape contemporaneous with the murder.

31.     When Crystal Hudson's body was examined, the medical examiner identified the presence of many sperm head cells and took fingernail scrapings.

32.     Contemporaneous DNA testing of the smears demonstrated that Plaintiff was not the perpetrator of the rape—to be clear, he was expressly excluded as a source of DNA from the biological evidence taken from either the vaginal or rectal smears.

**Police Defendants Immediately Arrested Plaintiff**

33.     Plaintiff had absolutely nothing to do with the murder of Crystal Hudson—this is demonstrated by the fact that he was expressly excluded by DNA analysis as the man who committed the rape that happened simultaneously with the murder

34.     The DNA analysis from biological evidence that was left as a result of the struggle before Ms. Hudson's murder—from under her fingernails (consistent with her efforts to fight off her attacker), her vagina, and rectum—*excludes* Plaintiff as the perpetrator.

35.     Plaintiff was only targeted because he was in Ms. Hudson's apartment. Plaintiff had been occasionally staying with Hudson at her apartment, but had not known where Hudson had been before her body was found.  In fact, Plaintiff had been asking family and neighbors if they had seen her.

36.     Despite having nothing to do with the rape or murder, Mr. King was arrested immediately after police arrived at the apartment. There was no probable

7

cause to arrest Plaintiff, as there was zero evidence that he had anything to do with these horrible crimes.

### Police Defendants Manufacture Evidence to Implicate Plaintiff

37.     After he was arrested, Plaintiff's clothes were collected and analyzed for blood, fibers from the scene, or other evidence from the crime scene. No incriminating physical evidence was ever found.

38.     Because he was innocent, Plaintiff consented to a body examination— fingernail scrapings were done, blood was drawn, saliva and hair samples were taken, and he was searched for signs of injury consistent with a physical struggle. No physical evidence was ever uncovered to connect him to the rape and/or murder.

39.     Despite physical evidence that unequivocally excluded Plaintiff as Ms. Hudson's attacker with not one shred of physical evidence implicating Plaintiff in the rape and/or murder, police immediately focused on Plaintiff as the murderer simply because it was easier to fabricate evidence against him than to do the work necessary to find the real killer.

40.     With the dearth of evidence implicating Plaintiff, Police Defendants set about creating false evidence against Plaintiff.

41.     There has never been any dispute that the sperm cells recovered from Ms. Hudson's body did not match Plaintiff's blood type.

42.     Moreover, DNA testing confirmed that the tissue scrapings from underneath Ms. Hudson's fingernails and the semen from the rectal and vaginal smears all shared the same DNA—this DNA is evidence of a violent struggle that did not involve Plaintiff.

43.     As further evidence of their intent to frame Plaintiff, Defendants did not seek to have the DNA evidence recovered from Crystal Hudson's body uploaded

8

into a national database to compare it with other DNA profiles to find the real killer.

44.     Instead, Police Defendants fabricated statements by Plaintiff related to the location of his jacket in Ms. Hudson's apartment. This fabrication was meant to make it appear as if Plaintiff lied about his knowledge of the location of Ms. Hudson's body, and was used as justification to arrest Plaintiff for the murder. To be clear, the inculpatory statements attributed to Plaintiff by Police Defendants were fabricated.

45.     Police Defendants also preyed on the emotional fragility of Ms. Hudson's two young minor children who had just lost their mother.

46.     Police Defendants fabricated information from Ms. Hudson's young minor children to falsely implicate Plaintiff in the rape and murder. They did so by manipulating the girls' statements and memories of what they had seen through suggestive and coercive questioning. The manipulated statements were meant to generate details to falsely make it appear as if Plaintiff had committed the rape and murder.

47.     This witness manipulation caused one or both of the girls to offer false inculpatory information that included, but is not limited to: (1) the girls not having access to keys to the apartment (meant to support a false narrative that Plaintiff locked the girls out of the apartment); (2) a vague identification of Plaintiff being present at Ms. Hudson's supposedly locked apartment at a time when he was not actually there but when the rape/murder could possibly have taken place; (3) a statement that on the night of the murder, one of the girls heard a male voice "like" Plaintiff's and that the man refused to open the door; (4) a false description about Plaintiff's activities to make him appear guilty; and (5) the timing of their entry and exit from the apartment which made it seem that Plaintiff had opportunity to

9

commit the rape/murder. To be clear each of these statements were fabricated through manipulation and were inconsistent with the girls' original statements. These fabricated statements were developed by Police Defendants to support their theory of the rape and murder and to make it appear falsely that Plaintiff had both the opportunity and intent to rape and murder Ms. Hudson.

48.     In the alternative, Police Defendants directly fabricated statements purportedly from Ms. Hudson's young daughter, Brandi, that: (1) Plaintiff was present in Ms. Hudson's apartment at various times when Brandi says that he was not; (2) Brandi described to them a conversation with Plaintiff the night before the body was discovered in which Plaintiff was in the apartment and denied knowing where Ms. Hudson was (she denies that this conversation happened); and/or (3) Brandi and her younger sister were locked out of Ms. Hudson's apartment, when in reality Brandi says that she entered and exited the apartment multiple times and Brandi later confirmed that she had her mother's keys and that her mother frequently left her apartment unlocked. The above fabricated statements attributed to Brandi were designed to make it appear falsely that Plaintiff had both the opportunity and intent to rape and murder Ms. Hudson.

49.     Police Defendants failed to disclose the above manipulation and/or outright fabrication.

50.     In order to explain the different versions caused by their manipulation and/or fabrication, and to hide that manipulation and/or fabrication, Police Defendants falsely claimed that the girls were initially "confused" or "blocking the events."

51.     Police Defendants further hid this manipulation and/or fabrication by failing to document all of the communications they had with the girls. For instance,

they failed to document that Brandi told them that Ms. Hudson frequently kept her apartment door open.  They failed to disclose this inculpatory statement because it was evidence that other persons besides Plaintiff would have the opportunity to rape and murder Ms. Hudson.

52.     Police Defendants also fabricated evidence by manipulating and/or threatening at least one witness into retracting evidence that supported Plaintiff's innocence.

53.     Police Defendants further destroyed exculpatory evidence by destroying police reports and notes made contemporaneously with the investigation and/or by collectively interviewing Ms. Hudson's two minor daughters along with Ms. Hudson's mother in an effort to create a false unified inculpatory narrative.

54.     Defendant Gunsch was the supervisor who oversaw the entirety of fabrication of evidence by Police Defendants' fabricated evidence.

**Forensic Defendants Fabricated Evidence to Support
a False Timeline of the Rape to Implicate Plaintiff**

55.     The physical evidence established that the rape was contemporaneous with the murder because: (1) the type of trauma injury to the rectum and anus, including hemorrhaging; (2) the hemorrhaging from the rectal injury did not contain white blood cells (which would be expected if the victim had remained alive as the body would react to the trauma); and (3) the autopsy examination revealed that semen was dripping from the rectum indicating that it was recently deposited.

56.     The blood type and DNA profile from the sperm from the rectal and vaginal smears expressly excluded Plaintiff as the man who had raped Mr. Hudson at the time of the murder.

57.    That DNA profile of the rapist matches the DNA profile from biological material taken from under Ms. Hudson's fingernails further supporting that Ms. Hudson tried to fight off the man who raped her.

58.    That man is *not* Plaintiff, who does not match the DNA profile. In short, Plaintiff is totally innocent of the contemporaneous rape and murder.

59.    Police Defendants' fabricated case against Plaintiff, therefore, looked like it might unravel because DNA evidence from the vaginal and rectal smears from the victim demonstrated conclusively that it was not Plaintiff who committed the contemporaneous rape.

60.    Because the forensic evidence established that it was not Plaintiff who raped and murdered Ms. Hudson, Police Defendants worked with Forensic Defendants to fabricate false forensic "science" to suggest that the rape was not contemporaneous with the murder.

61.    Forensic Defendants fabricated false opinions, totally unsupported by the contemporary science and the physical evidence, that the sperm cells found in and "leaking out" of Ms. Hudson's rectum and vagina were likely deposited days before the rape and murder as a result of consensual sexual intercourse. Forensic Defendants knew that their opinions were false and not supported by the science at the time.

62.    Forensic Defendants also offered false opinions that the semen secretions could not have been contemporaneous with Ms. Hudson's murder.

63.    To be clear, Forensic Defendants' fabricated evidence was not supported by the actual physical evidence or by accepted science at the time.

64.    None of the Forensic Defendants disclosed that his/her opinions were false. Rather, each withheld that exculpatory evidence from Plaintiff.

65.     More specifically, Defendants Challener, Balraj, and May all developed forensic opinions that each knew was not supported by the known forensic science at the time, but instead were made up to falsely implicate Plaintiff.

66.     In their report, Defendants Challener and/or Balraj concluded, "Few intact sperm and many sperm heads in vaginal and rectal smears."

67.     Forensic science at the time supported that the presence of the sperm heads and, specifically, "intact" sperm was entirely consistent with and supported the strong evidence of the contemporaneous rape and murder.

68.     Contrary to established forensic science at the time, however, Defendants Challener, Balraj, and/or May developed a knowingly baseless opinion that the physical evidence supported that the sperm and deposits pre-dated the murder. This opinion was not supported by the science at the time and was a total fabrication made by Defendants Challener , May, and/or Balraj to falsely implicate Plaintiff. That opinion was subsequently used against Plaintiff at trial.

69.     Further, Defendants Challener and/or Balraj created "opinions" totally contrary to known science at the time to downplay the prevalence of sperm found on the vaginal and rectal smears. They generated a knowingly false scientific opinion claiming that the small number of "intact" sperm and sperm heads meant that the semen/sperm was deposited days before the murder. This was false; the physical evidence at the time showed that there was a large number of "intact" sperm and sperm heads, which was strong evidence that the rape happened contemporaneous with the murder.

70.     Moreover, Defendants Challener and/or Balraj created knowingly false opinions to hide the significance of the presence of sperm in Ms. Hudson's rectum, which had strong evidence of trauma stemming from a rape. They did this by falsely

13

suggesting that the sperm was found only in Ms. Hudson's vagina.  They misrepresented this fact because the serious rectal injuries obviously occurred contemporaneously with the murder—and could not have predated the murder because it would have been obvious and discovered by friends and family of Ms. Hudson—so they deliberately hid that the biological evidence (which excluded Plaintiff as the sources) was related to that injury.

71.     Plaintiff's post-conviction forensic experts presented unrebutted evidence to support Plaintiff' innocence that the semen was deposited contemporaneously with the rape and murder of Ms. Hudson. They also offered opinions that the science was well known in the field of forensic science at the time of the murder that the amount, intactness, and location of sperm and semen deposits were consistent with the contemporaneous rape and murder of Ms. Hudson.

72.     Defendant May also provided knowingly false opinions to support the wrongful arrest, prosecution, and imprisonment of Plaintiff. She analyzed the sperm but knowingly and falsely misrepresented the amount of sperm in her analysis. She did this to further Defendants Challener and/or Balraj's knowingly false opinions that the quantity and quality of sperm heads supported that the rape was not contemporaneous with the murder. Defendant May's false description about the number of sperm heads was directly contrary to the physical evidence.

73.     Moreover, Defendant May (consistent with Defendants Challener and/or Balraj as stated above) intentionally misstated forensic science to draw false conclusions about the likely timing of the deposit of semen/sperm as days before the contemporaneous rape and murder of Ms. Hudson.  This fabricated science was contrary to the known forensic science at that time.

74. To start with, Defendant May offered a knowingly false opinion about the likely deposit of the semen/sperm based on the purported absence of a protein — $P_{30}$—from the semen analyzed from the vaginal and rectal smears. She falsely opined—knowingly contrary to the known science at the time—that the absence of $P_{30}$ in the semen taken from the vaginal and rectal smears meant that the semen was deposited days before the murder (despite all of the physical evidence strongly supporting that the vaginal and anal rape happened at the time of the murder). At the time, it was generally understood in the serology field that the inability to detect p30 from semen says nothing about when the semen was deposited.

75. Not only was that opinions knowingly false to Defendant May (because it was contrary to the known science), but she also wrote two entirely inconsistent reports about the presence of the $P_{30}$ protein in the semen that was analyzed. But she only disclosed one of those reports before December 2018 (produced in this case)—the report that was used against Plaintiff in his criminal trial which stated "negative [$P_{30}$] reaction for semen."

76. On February 5, 2019, Defendant May admitted to this Court that she hid the other report, which gave the exact opposite conclusion—"positive [$P_{30}$] reaction for semen." This report sat in Forensic Defendants' files unknown to anyone else for over 24 years—from 1994 until December 2018.

77. Forensic Defendants all hid this exculpatory evidence of a totally opposite $P_{30}$ test (positive instead of negative).

78. The newly disclosed report is direct evidence that not only did Defendant May fabricate her opinion about the significance of the presence of $P_{30}$ itself (knowingly falsely stating that the absence of $P_{30}$ meant that the rape was not contemporaneous with the murder—an opinion totally unsupported by the known

15

forensic science at the time), but that she fabricated the outcome of the $P_{30}$ test itself (falsely stating that the results were negative when in fact they were positive).

79.     Defendant May, therefore, fabricated knowingly false forensic science opinions and/or forensic test results themselves related to the $P_{30}$ proteins. The false forensic science opinion and/or test results were subsequently used against Plaintiff in his criminal trial in a successful effort to falsely implicate Plaintiff.

80.     Forensic Defendants all withheld the exculpatory evidence of the contrary test results.

81.     To hide evidence of the above fabrications and/or withholding of exculpatory evidence, County Defendants denied Plaintiff access to the DNA evidence and, instead, negligently and/or knowingly destroyed that evidence.

**Defendants Suppress the Fabrication**

82.     In order to hide the absence of forensic support behind their fabrications about the prevalence of sperm cells, Forensic Defendants hid and/or destroyed exculpatory evidence that could have been used to prove the fabrications. This evidence includes but is not limited to: the microscopic slides prepared at Crystal Hudson's autopsy, all of the microscopic slides prepared by the Cuyahoga County Crime Lab, and all of the laboratory bench notes from the testing (including original-quality photographs of the DNA quantification assays and DQA1/Polymarker test strips.

83.     In addition to the affirmative suppression of exculpatory evidence, Police and/or Forensic Defendants collected evidence, but did not disclose the evidence that was collected so that Plaintiff could not have that evidence further tested. In this way, they withheld potentially exculpatory evidence from Plaintiff and the prosecution because the identification of that evidence was unavailable.

**Plaintiff's Wrongful Conviction and Imprisonment**

84.     As a result of Defendants' misconduct, Plaintiff was tried by a jury in 1995. Plaintiff contested guilt at every stage of his arrest and prosecution.

85.     During the trial, the false evidence developed by Police and Forensic Defendants was used against Plaintiff.

86.     On February 28, 1995, a jury convicted Plaintiff of Crystal Hudson's murder.  He was sentenced to fifteen years to life imprisonment.

87.     Without Defendants' fabricated evidence, Plaintiff never would have stood trial and never would have been convicted of murder. Without this false evidence, there was nothing to support a criminal proceeding against Plaintiff.

88.     Likewise, had Defendants disclosed the exculpatory evidence that would ultimately exonerate Plaintiff, he never would have been arrested, let alone convicted of these crimes for which he is innocent.

**Plaintiff's Exoneration**

89.     Plaintiff never gave up on proving his innocence.

90.     In January 2017, a new Cuyahoga County Prosecutor undertook a review of Plaintiff's case while Plaintiff's legal team was challenging Plaintiff's conviction based on the forensic evidence demonstrating that Ms. Hudson was raped and murdered contemporaneously and that Plaintiff could not have been the source of the DNA from the perpetrator.

91.     The Cuyahoga County Prosecutor agreed that Plaintiff was not the perpetrator and, on April 14, 2017, filed a motion to vacate Plaintiff's conviction.

92.     As a result, all charges were dismissed against Plaintiff. After twenty-three years wrongfully behind bars for a crime that he did not commit, Plaintiff walked free.

### Plaintiff's Damages

93.     Plaintiff was in his mid-thirties, in the prime of his life, at the time that he was wrongly arrested and convicted. He was arrested, prosecuted, and convicted for no good reason. Plaintiff would spend the next two plus decades imprisoned for something he did not do.

94.     Plaintiff's whole life was turned upside down without any warning. A substantial portion of his adulthood has been consumed by the horror of his wrongful imprisonment.

95.     Plaintiff was taken away from family and friends. Because of Defendants' misconduct, Plaintiff has missed out on the lives of his family and friends. This included being ripped from his three young children.

96.     Plaintiff's unlawful arrest and prosecution immediately caused him to suffer emotionally and physically. That harm continues to this day.

97.     Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

98.     During his decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

99.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Defendants' misconduct continues to cause Plaintiff

extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

100.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

101.     In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

102.     Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

103.     Defendants fabricated and solicited false evidence, including testimony that they knew to be false, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial. In addition, Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that Defendants knew to be false. Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

104. In addition, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

105. Defendants who were supervisors charged with overseeing the investigation of the Hudson rape/murder and the other individually named Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and fully investigate the rape/murder.

106. Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

107. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

108. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

109. Plaintiff's injuries were caused by the official policies of Defendant City of Cleveland, the Cleveland Police Department, Cuyahoga County, and/or Cuyahoga County Coroner Balraj (collectively "Municipal Defendants") by the practices and customs of Municipal Defendants, as well as by the actions of final policymaking officials for Municipal Defendants.

110.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Municipal Defendants promulgated rules, regulations, policies, and procedures governing witness interviews, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the Municipal Defendants, including employees and agents of Municipal Defendants.

111.    These rules, regulations, policies, and procedures were implemented by employees and agents of Municipal Defendants, including the individually named Defendants, who were responsible for conducting investigations of crimes in and around Cleveland, Ohio.

112.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Municipal Defendants had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and/or were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

113.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Municipal Defendants directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

21

114.     The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Municipal Defendants, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115.     The misconduct described in this Count was undertaken pursuant to the policy and practices of Municipal Defendants in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for Municipal Defendants, or were actually committed by persons with such final policymaking authority.

116.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

117.     Plaintiff's injuries were caused by officers, agents, and employees of the Municipal Defendants, including but not limited to the individually named Defendants, who acted under the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

118.     The improper police conduct in the Cleveland Police Department is so bad that national news sources have reported that the City of Cleveland "is also under pressure to fix a troubled police department that has cost the city millions of dollars in judgments and settlements of lawsuits for abusive behavior by officers."

119.     The policies and practices of the Municipal Defendants described herein were responsible for a large number of wrongful arrests, prosecutions, and/or convictions stemming from misconduct similar to what occurred here. These

22

wrongful convictions were a double tragedy—innocent lives were ruined and the true culprits were allowed to go free, perhaps committing additional crimes and generating additional victims.

120. The wrongful convictions identified in the preceding paragraph include but are not limited to:

a. Leonard O'Neil was wrongfully arrested, charged, and convicted in 1971 of a robbery he did not commit.

b. Harllel Jones was wrongfully arrested, charged, and convicted in 1972 of a second degree murder;

c. Ricky Jackson, Wiley Bridgemann, and Kwame Ajamu were falsely accused and convicted of murder based on an improper police investigation stemming from a 1975 murder;

d. Ronald Larkins was wrongfully arrested, charged, and convicted of a robbery and murder that occurred in 1981;

e. Raymond Towler was wrongfully arrested, charged, and convicted of a 1981 rape and kidnapping;

f. George Seiber was wrongfully arrested, charged, and convicted of a 1987 assault and theft;

g. Anthony Michael Green was wrongfully arrested, charged, and convicted of rape in 1988 based on an improper police investigation (including forensic evidence fabrication);

h. Joseph D'Ambrosio was wrongfully arrested, charged, and convicted for a 1988 kidnapping and murder;

i. Darrel Houston was wrongfully arrested, charged, and convicted for a 1991 murder;

23

j. Jack Dempsey was wrongfully arrested, charged, and convicted of arson and burglary that occurred in 1995;

k. Anthong Lemos was wrongfully arrested, charged, and convicted of a 1994 attempted murder and murder;

l. Thomas Siller was wrongfully arrested, charged, and convicted of a 1997 kidnapping, robbery and murder;

m. Walter Zimmer was wrongfully arrested, charged, and convicted of a 1997 kidnapping, robbery and manslaughter;

n. David Ayers was wrongful arrested, charged, and convicted of murder in 1998 based on an improper police investigation; and

o. RuEl Sailor was wrongfully arrested, charged, and convicted of murder in 2002 based on an improper police investigation.

## COUNT II
### 42 U.S.C. § 1983 – Federal Malicious Prosecution and/or Deprivation of Liberty Without Probable Cause

121.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

122.     In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

123.   In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

124.   The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

125.   Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Ohio law does not provide an adequate state-law tort remedy to redress that harm.

126.   In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a possible crime of which he was totally innocent, through Defendants' fabrication, suppression, and/or destruction of evidence.

127.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

128.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

129.   All judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence, when all charges were dismissed against Plaintiff.

130.   Defendants' misconduct described in this Count was undertaken under the policies, practices, and customs of Municipal Defendants, and by

25

Defendants who were final policymakers for Municipal Defendants, in the manner more fully described above.

## Count III – 42 U.S.C. § 1983
### Due Process – Destruction of Evidence

131.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132.  In the manner described more fully above, Defendants Challener, Balraj, and/or May destroyed physical evidence that Plaintiff could have used to further prove his innocence.

133.  The exculpatory value of that evidence was apparent to the Defendants.  In the alternative, the evidence was potentially exculpatory, and the Defendants knew that.

134.  Nonetheless, the Defendants negligently destroyed the evidence.  In the alternative, Defendants acted in bad faith in destroying the evidence.

135.  As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to, emotional distress more fully alleged herein.

136.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

137.  The misconduct described in this Count was undertaken by employees and agents of Cuyahoga County, including but not limited to the County Defendants, pursuant to the policies and practices of Cuyahoga County more fully described above.  This includes but is not limited to destroying evidence to prevent defendants from proving their innocence.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

138.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139.     After the rape/murder identified above, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for raping and murdering Ms. Hudson, crimes he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

140.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

141.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

142.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

143.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

27

144.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Municipal Defendants, and by Defendants who were final policymakers for Municipal Defendants, in the manner more fully described above.

## COUNT V
## 42 U.S.C. § 1983 – Failure to Intervene

145.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146.    In the manner described above, during the constitutional violations described herein, one or more of Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

147.    As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

148.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

149.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

150.    Defendants' misconduct described in this Count was undertaken under the policies, practices, and customs of Municipal Defendants, and by

Defendants who were final policymakers for Municipal Defendants, in the manner more fully described above.

## COUNT VI
### 42 U.S.C. § 1983 – Supervisory Liability

151.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

152.    The constitutional injuries complained-of herein were proximately caused by the intentional misconduct of the supervisory Defendants, who were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

153.    Specifically, these supervisory Defendants were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain false evidence, or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

154.    Moreover, these supervisory Defendants were aware of and facilitated, conducted, and oversaw the withholding of exculpatory evidence, including but not limited to statements made by witnesses and/or forensic evidence, but failed to disclose that information, or were deliberately, willfully or recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

155.    The supervisory Defendants were acting under color of law and within the scope of their employment when they took these actions.

156.    As a direct and proximate result of the actions of the supervisory Defendants, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and

injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
## Ohio State Law – Malicious Prosecution

157.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158.    In the manner described more fully above, Defendants, acting maliciously, individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime for which he is innocent. Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

159.    Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

160.    Defendants' statements regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information.

161.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

162.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

163.     As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII
## Ohio State Law – Intentional Infliction of Emotional Distress

164.     Each paragraph of this Complaint is incorporated as if restated fully herein.

165.     In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, intentionally or recklessly engaged in extreme and outrageous conduct that caused Plaintiff serious, severe emotional distress as well as bodily harm. Defendants' misconduct was the actual and proximate cause of Plaintiff's emotional distress and bodily harm.

166.     Defendants' were acting under color of law and within the scope of their employment when they took these actions.

167.     Through the doctrine of *respondeat superior*, Municipal Defendants are liable as principal for all torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

168.     As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IX
## Ohio State Law – Civil Conspiracy

169.     Each paragraph of this Complaint is incorporated as if restated fully herein.

170.     In the manner described more fully above, the Defendants, acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

171.     In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

172.     Defendants were acting under color of law and within the scope of their employment when they took these actions.

173.     Through the doctrine of *respondeat superior*, Municipal Defendants are liable as principal for all torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

174.     As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count X
## Ohio State Law – *Respondeat Superior*

175.     Each paragraph of this Complaint is incorporated as if restated fully herein.

32

176.    While committing the acts alleged in the preceding paragraphs, Defendants were employees and agents of the Municipal Defendants, acting at all relevant times within the scope of their employment.

177.    While committing the acts alleged in the preceding paragraphs, the behavior of Defendants was calculated to facilitate and/or promote the business for which they were employed by their employers, Municipal Defendants.

178.    Municipal Defendants are liable as principals for all torts committed by its agents.

## COUNT XI
## State-Law Claim – Indemnification

179.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

180.    Ohio law provides that Municipal Defendants are to pay tort judgments for compensatory damages for which its employees are liable within the scope of their employment activities.

181.    Defendants were employees, members, and agents of the Municipal Defendants, acting at all relevant times within the scope of their employment in committing the actions and/or omissions described herein.

WHEREFORE, Plaintiff, EVIN KING, respectfully requests that this Court enter a judgment in his favor and against Defendants CLEVELAND POLICE OFFICERS DENNIS GUNSCH, GREGORY KUNZ, ESTATE OF ROBERT MATUSZNY, THOMAS MILLER, MICHAEL O'MALLEY, and TIMOTHY ZBIKOWSKI, CITY OF CLEVELAND, a municipal corporation, ESTATE OF ROBERT CHALLENER, KAY MAY, ELIZABETH K. BALRAJ, Cuyahoga County Coroner, and CUYAHOGA COUNTY awarding compensatory damages, attorneys'

fees and costs against each Defendant, punitive damages against each of the

individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, EVIN KING, hereby demands a trial by jury under Federal Rule of

Civil Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED,
**EVIN KING**


BY:  /s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Danielle Hamilton
Mark Loevy-Reyes
LOEVY & LOEVY
311 North Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
mark@loevy.com


## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, certify that the foregoing was sent via CM/ECF to all

counsel of record.


/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*