**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

EVIN KING,                  )

                           )

       Plaintiff,          )

                           )        Case No. 18-cv-02353

       v.                )        Honorable Dan A. Polster

                           )

CLEVELAND POLICE OFFICERS    )

ROBERT MATUSZNY, GREGORY KUNZ,    )

MICHAEL O'MALLEY, THOMAS    )

MILLER, TIMOTHY ZBIKOWSKI,    )

DENNIS GUNSCH, CITY OF    )

CLEVELAND, a municipal corporation,    )

ROBERT CHALLENER, KAY MAY, and    )

ELIZABETH K. BALRAJ, Cuyahoga County    )

Coroner sued in her individual and official    )

capacities, and CUYAHOGA COUNTY,    )

                           )

       Defendants.      )

                           )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**POLICE DEFENDANTS AND DEFENDANT CITY OF CLEVELAND'S**
**MOTIONS TO DISMISS (DKT. 49 AND 54)**

Arthur Loevy
Jon Loevy
Danielle Hamilton
Mark Loevy-Reyes
LOEVY & LOEVY
311 North Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
hamilton@loevy.com

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION ......................................................................................................... 5

FACTS ......................................................................................................................... 6

LEGAL STANDARD ................................................................................................... 12

ARGUMENT ............................................................................................................... 14

    **I.**    **Plaintiff's Allegations Against Police Defendants are Sufficiently Pled** ............... 14

        **A.**  **Plaintiff's Allegations Adequately Notify Police Defendants of the Claims against Them** ........................................................................... 14

        **B.**  **The Complaint's Allegations of Conspiracy Are Sufficient** ........................... 17

    **II.**    **Plaintiff's Claims Against Defendant Estate of Matuszny Should Not Be Dismissed** ....................................................................................... 19

    **III.**    **Plaintiff's *Monell* Claim Against the City of Cleveland is Sufficiently Pled** ........ 20

    **IV.**    **The City is not Immune from All of Plaintiff's State Law Claims** ....................... 22

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

*A.M.S. v. Steele*, 2012 WL 2130971 (S.D. Ohio June 8, 2012) .................................................. 20

*Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991) ....................................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. passim

*Ayers v. City of Cleveland*, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013) ............................. 22, 23

*Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008) ...........................................................................11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544(2007) .................................................................. passim

*Berry v. Cahoon*, 731 F. Supp. 2d 685 (S.D. Ohio 2010) ............................................................15

*Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) ............................................................................15

*Bright v. Gallia Cty., Ohio*, 753 F.3d 639 (6th Cir. 2014) ...........................................................19

*City of Memphis v. Roberts*, 528 S.W.2d 201(Tenn. 1975) ....................................................22, 23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ....................................12

*Courtright v. City of Battle Creek*, 839 F.3d 513(6th Cir. 2016)..................................................11

*Dixon v. Holden*, 923 S.W.2d 370 (Mo. App. Ct. 1996) ..............................................................23

*Guertin v. Michigan*, 2017 WL 2418007 (E.D. Mich. June 5, 2017) ...........................................14

*HDC, LLC v. City of Ann Arbor*, 675 F.3d 608 (6th Cir. 2012) ...................................................12

*Hebshi v. United States*, 12 F. Supp. 3d 1036 (E.D. Mich. 2014) ................................................14

*Horn v. City of Covington*, 2015 WL 4042154 (E.D. Ky. July 1, 2015) .......................................14

*In re Auto. Parts Antitrust Litig.*, 2014 WL 4248430 (E.D. Mich. Aug. 27, 2014)......................12

*In re Duramax Diesel Litig.*, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) ...............................14

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010)...............................12

*In re Southeastern Milk Antitrust Litig.*, 555 F.Supp.2d 934 (E.D. Tenn. 2008) ........................ 12

*Jackson v. City of Cleveland*, 920 F.3d 340 (6th Cir. 2019).........................................................19

*Keys v. Humana, Inc.*, 684 F.3d 605 (6th Cir. 2012) .................................................................. 12

i

*Koh v. Graf*, 2013 WL 5348326 (N.D. Ill. Sept. 24, 2013) ...........................................................14

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) .19

*Lyons v. Jacobs*, 2017 WL 4168369 (S.D. Ohio Sept. 20, 2017)............................................14, 15

*Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898 (6th Cir. 2004) ......................................................................................................................16

*Ortega v. ICE*, 737 F.3d 435 (6th Cir. 2013)...............................................................................11

*Paolisso v. Edison Local Bd. of Educ.*, 1992 WL 19829 (Ohio App. Ct. Feb. 5, 1992) .............. 23

*Patterson v. Burge*, 328 F. Supp. 3d 878 (N.D. Ill. 2004)............................................................15

*Quinones v. Szorc*, 771 F.2d 289 (7th Cir. 1985) .........................................................................17

*Stack v. Karnes*, 750 F.Supp.2d 892, 899 (S.D. Ohio 2010) ........................................................21

*Stengel v. Columbus*, 600 N.E.2d 248 ..........................................................................................24

*Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005) .............................................20

*Tinney v. Richland Cty.*, 2014 WL 6896256 (N.D. Ohio Dec. 8, 2014).........................................19

*Rhodes v. R & L Carriers, Inc.*, 491 F. App'x 579, 583 (6th Cir. 2012)  .....................................12

*Vaughan v. City of Shaker Heights* 2011 WL 5966732 (N.D. Ohio Nov. 28, 2011) ............. passim

*Wilkinson v. Greater Dayton Reg'l Transit Auth.*, 2012 WL 5879782 (S.D. Ohio Nov. 21, 2012)12

*Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 799 (6th Cir. 2012)........................................11

*Womack v. Conley*, 595 F. App'x 489, 2014 WL 6997493 (6th Cir. Dec. 11, 2014) ....................17

**INTRODUCTION**

Plaintiff Evin King spent twenty-three years in prison after he was wrongfully convicted of a rape and murder he did not commit. Mr. King's Amended Complaint explains in great detail that his wrongful conviction was no accident. Rather, as the Amended Complaint explains, the Defendants worked in concert to frame Mr. King. Specifically, Defendants Dennis Gunsch, Gregory Kunz, Robert Matuszny, Thomas Miller, Michael O'Malley, and Timothy Zbikowski ("Police Defendants") fabricated and suppressed evidence including witness statements to falsely claim that Mr. King had the opportunity and intent to commit the crimes, and Defendants Robert Challener, Kay May, and Elizabeth Balraj ("Forensic Defendants") fabricated forensic evidence to falsely claim that the rape of Ms. Hudson did not happen simultaneously with her murder, which was necessary to explain away the powerful exculpatory evidence that the DNA found in Ms. Hudson's body did not match Mr. King.

Given the substantial, detailed allegations of wrongdoing in Plaintiff's Amended Complaint, Cuyahoga County and the Forensic Defendants appropriately filed an answer rather than moving to dismiss (in contrast to the County's previous decision in moving to dismiss Plaintiff's initial complaint). *See* Dkt. 47. By contrast, the City of Cleveland and the Police Defendants filed perfunctory motions to dismiss with ample recitations of the law but little argument as to why they are entitled to a dismissal. The arguments they do make are easily resolved in Plaintiff's favor. Police Defendants' argument that Plaintiff has engaged in impermissible "group pleading" is wrong on the law, as is the argument that Section 1983 claims do not survive a defendant's death. So too for the City's argument that it is immune to Plaintiff's indemnification claim. Likewise, the City's contention that Plaintiff has not pled enough incidents of unconstitutional conduct to support a *Monell* claim is belied by several paragraphs of well-pleaded allegations in the Amended Complaint.

5

Plaintiff's First Amended Complaint adequately alleges serious constitutional violations, and the City's and Police Defendants' motions should be denied.

## FACTS

As recounted in rich factual detail in the Amended Complaint, Mr. King was wrongfully convicted of a rape and murder that he did not commit. Dkt. 45, at ¶ 6.

Without re-counting every detail, pertinent facts for present purposes include: Crystal Hudson was raped and murdered sometime between the evening of June 20, 1994 to the morning of June 22, 1994. Her naked body was hidden in a closet in her apartment. *Id.* at ¶ 27. The physical injuries to Ms. Hudson's body—including hemorrhaging of her rectum, hits and scrapes on the head, and being strangled—and the presence of sperm found in the rectum were consistent with anal rape, and demonstrated that the rape and murder happened at the same time. *Id.* at ¶¶ 28, 29, 30. Contemporaneous DNA testing was done on vaginal and rectal smears and fingernail scrapings recovered from Ms. Hudson's body. *Id.* at ¶¶ 31, 32.

The Police Defendants, led by Supervisory Defendant Gunsch, were assigned to investigate the rape and murder of Ms. Hudson. During their investigation, the Police Defendants created reports and conducted an investigation of Mr. King, who was in Ms. Hudson's apartment when her body was found. *Id.* at ¶¶ 35-36, 54. Mr. King's clothes were collected and analyzed and he consented to a body examination where fingernail scrapings were done, blood was drawn, saliva and hair samples were taken, and he was searched for signs of injury consistent with a physical struggle. *Id.* at ¶¶ 37-38.

The Police Defendants' investigation revealed that Mr. King had nothing to do with the crimes. No physical evidence was ever uncovered to connect Mr. King to the rape or murder— no incriminating evidence was ever found on his clothes or on his body. *Id.* Most importantly,

Mr. King was not the source of the DNA found on the vaginal or rectal smears or fingernail scrapings recovered from Ms. Hudson's body. *Id.* at ¶¶ 32, 33, 34, 41, 42.

With no evidence implicating Mr. King, the Police Defendants set out to close the investigation by creating a false case against him by fabricating inculpatory evidence and withholding exculpatory evidence. *See id.* at ¶ 40. Plaintiff's Amended Complaint explains in great detail what evidence was fabricated and withheld by Police Defendants.

To start, Plaintiff plausibly alleges two alternative theories of how the Defendants fabricated evidence relating to Ms. Hudson's daughters. *Id.* at ¶ 45, 46, 47, 48. First, the Amended Complaint alleges that the Defendants manipulated the young girls into making false statements. Specifically, through suggestive and coercive questioning, Police Defendants used suggestive and coercive questioning, causing one or both of the girls to offer false inculpatory information that included:

- the girls not having keys to the apartment (meant to support a false narrative that Plaintiff locked the girls out of the apartment);
- a vague identification of Plaintiff being present at Ms. Hudson's supposedly locked apartment at a time when he was not actually there but when the rape/murder could possibly have taken place;
- a statement that on the night of the murder, one of the girls heard a male voice "like" Plaintiff's voice, and that the man refused to open the door;
- a false description about Plaintiff's demeanor to make him appear guilty, including that he was acting strangely and refusing to open the door for the girls; and
- the timing of their entry and exit from the apartment which made it seem that Plaintiff had opportunity to commit the rape/murder.

*Id*. at ¶ 40.

Second, the Amended Complaint plausibly alleges that, in the alternative to manipulating the girls into making false statements, the Defendants outright fabricated statements and falsely attributed the statements to the girls, including the following statements:

- Plaintiff was present in Ms. Hudson's apartment at various times when Brandi says that he was not;

7

- Brandi described to them a conversation with Plaintiff the night before the body was discovered in which Plaintiff was in the apartment and denied knowing where Ms. Hudson was (she denies that this conversation happened); and/or
- Brandi and her younger sister were locked out of Ms. Hudson's apartment, when in reality Brandi says that she entered and exited the apartment multiple times, and Brandi later confirmed that she had her mother's keys and that her mother frequently left her apartment unlocked.

*Id.* at ¶ 48. Further, Police Defendants withheld their manipulation and/or outright fabrication, and instead falsely claimed that the girls were initially "confused" or "blocking the events." *Id.* at ¶¶ 49-50. In addition, in an effort to bolster the false statements, Police Defendants interviewed the girls along with Ms. Hudson's mother to plant their false theory in her head. Ultimately, this created a false unified narrative between Ms. Hudson's mother and the girls that Mr. King committed the crimes. *Id.* at ¶ 51.

Police Defendants did not stop there: they suppressed exculpatory statements made by the girls, including but not limited to Brandi's statement that Ms. Hudson frequently kept her apartment door open—exculpatory evidence that persons other than Mr. King had the opportunity to rape and murder Ms. Hudson. *Id.* at ¶ 51. And, the Police Defendants falsely claimed that Mr. King's jacket was found in the same closet where Mr. Hudson's body was found, which implied that Mr. King was with Ms. Hudson when she was raped and murdered. Then, when Mr. King truthfully denied putting his jacket in the closet, they used that denial to suggest that he was withholding information from them. *Id.* at ¶ 44. The Police Defendants also manipulated and/or threatened at least one or more alibi witnesses into retracting statements that supported Plaintiff's innocence. *Id.* at ¶ 52. Finally, they also destroyed exculpatory police reports and notes made contemporaneously with the investigation. *Id.* at ¶ 53.

But, even this was not enough. Because DNA evidence from the vaginal and rectal smears demonstrated conclusively Plaintiff did not rape Ms. Hudson, Police Defendants conspired with Forensic Defendants to fabricate forensic "science" to suggest that the rape was

not contemporaneous with the murder. *Id.* at ¶¶ 59, 60, 61. This fabricated evidence included false opinions by Defendants May and Challener that the sperm cells found in Ms. Hudson's rectum were deposited days before the murder and downplaying the prevalence of sperm found on the vaginal and rectal smears; falsely suggesting that sperm was only found in Ms. Hudson's vagina. *Id.* at ¶¶ 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76. Defendant Balraj signed the autopsy report that falsely described semen evidence and, as supervisor of Defendants May and Challener, approved the misconduct of her subordinates. *Id.* at ¶¶ 23, 75, 151-156.

In addition, the Forensic Defendants hid and/or destroyed exculpatory evidence that could have been used to prove their fabrications, including: microscopic slides prepared at Ms. Hudson's autopsy; all of the microscopic slides prepared by the Cuyahoga County Crime Lab; and all of the laboratory bench notes from the testing. *Id.* at ¶ 82.

Finally, to shore up their case against Mr. King with the false forensic evidence, Police and Forensic Defendants conspired not to seek to have the DNA evidence recovered from Ms. Hudson's body uploaded into a national database to compare it with other DNA profiles; and to hide physical evidence that was collected so that Mr. King could not have that evidence further tested. *Id.* at ¶¶ 43, 83.

The conspiracy between Police and Forensic Defendants was a success: through numerous violations of Mr. King's constitutional rights, Defendants were able to secure the wrongful conviction of Mr. King for crimes he did not commit. *Id.* ¶¶ 84, 85, 86, 87, 88.

Mr. King was not the first victim of this type of misconduct. The Amended Complaint includes detailed allegations showing that policies and practices of the City of Cleveland were responsible for a large number of arrests, prosecutions, and/or wrongful convictions stemming from misconduct similar to what occurred here. *Id.* at ¶ 119. In addition to Mr. King, the policies, practices, and customs of the City of Cleveland with respect to witness interviews, preservation

and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of its employees and agents were the moving force behind dozens of constitutional violations, including:

- Leonard O'Neil was wrongfully arrested, charged, and convicted in 1971 of a robbery he did not commit. Nineteen years old at the time he was questioned, O'Neil claimed that he confessed due to police pressure and taking advantage of his lack of sophistication with the criminal justice system. A reinvestigation of the crime also revealed that police knew about a potential suspect they described as a "look-a-like" to O'Neil, who later confessed to the crime.

- Harllel Jones was wrongfully arrested, charged, and convicted in 1972 of a second degree murder due to withholding of exculpatory witness statements;

- Ricky Jackson, Wiley Bridgemann, and Kwame Ajamu were falsely accused and convicted of murder based on an improper police investigation stemming from a 1975 murder—they were exonerated in 2014 after evidence came to light that when an eyewitness attempted to recant, police intimidated him to testify falsely;

- Ronald Larkins was wrongfully arrested, charged, and convicted of a robbery and murder that occurred in 1981 and exonerated in 2006 based on the police's withholding of extensive exculpatory evidence including eyewitness's failure to identify Larkins until police fed them details of the crime;

- Raymond Towler was wrongfully arrested, charged, and convicted of a 1981 rape and kidnapping and exonerated by DNA evidence in 2010;

- George Seiber was wrongfully arrested, charged, and convicted of a 1987 assault and theft. After a court ruled that the police withheld promises made to the eyewitness in exchange for his testimony and a police report with a description of the suspect that did not match Seiber, all charges against Seiber were dropped in 1999

- Anthony Michael Green was wrongfully arrested, charged, and convicted of rape in 1988 based on an improper police investigation (including forensic evidence fabrication) and exonerated in 2001 based on postconviction DNA results;

- Joseph D'Ambrosio was wrongfully arrested, charged, and convicted for a 1988 kidnapping and murder. A court barred a retrial of D'Ambrosio and ordered him to be released from custody due to repeated failure to turn over exculpatory evidence, including biological evidence from the victim that was hidden for over 20 years;

10

- Darrel Houston was wrongfully arrested, charged, and convicted for a 1991 murder due to police hiding evidence they received from the only eyewitness identifying a potential suspect;

- Jack Dempsey was wrongfully arrested, charged, and convicted of arson and burglary that occurred in 1995 due in part to the fire department failing to notify the prosecution of their investigation of an alibi witness;

- Anthony Lemons was wrongfully arrested, charged, and convicted of a 1994 attempted murder and murder and acquitted in 2014 due to evidence that police hid critical evidence of Lemons' innocence including police reports undermining a eyewitness's identification;

- Thomas Siller was wrongfully arrested, charged, and convicted of a 1997 kidnapping, robbery and murder due to fabricated blood test results by the state's blood analyst;

- Walter Zimmer was wrongfully arrested, charged, and convicted of a 1997 kidnapping, robbery and manslaughter due to fabricated blood test results by the state's blood analyst;

- David Ayers was wrongful arrested, charged, and convicted of murder in 1998 based on an improper police investigation including violating Ayres's constitutional right not to be questioned without his lawyer; and

- RuEl Sailor was wrongfully arrested, charged, and convicted of murder in 2002 based on an improper police investigation including fabricated witness identifications.

*Id.* at ¶¶ 109, 110, 111, 112, 113, 114, 115, 116, 119. Indeed, the misconduct in the Cleveland Police Department is so pervasive that national news sources have reported that the City "is under pressure to fix a troubled police department that has cost the city millions of dollars in judgments and settlements of lawsuits for abusive behavior by officers." *Id.* at ¶ 118.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "pleading standard Rule 8 announces does not require 'detailed factual allegations,'" only "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "the complaint need not set out the facts in detail," *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 799 (6th Cir. 2012), and in the civil rights context a complaint may only be dismissed "if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings." *Ortega v. ICE*, 737 F.3d 435 (6th Cir. 2013).

In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). In so doing, the Court must also consider the totality of the Complaint rather than viewing it piecemeal. *See, e.g.*, *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) (noting a conclusory allegation but pointing to the factual allegations and then holding that "[t]aken as a whole, and considered in the light most favorable to [the plaintiff], the factual allegations in the complaint state[d] a plausible" § 1983 claim).

This is especially true when analyzing allegations of a conspiracy. As the Supreme Court has explained—and in the context where the standard of proof is far higher than the one at the motion to dismiss stage in a civil-rights suit— "[plaintiffs] should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by

12

dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted); *see also In re Auto. Parts Antitrust Litig.*, 2014 WL 4248430, at *4 (E.D. Mich. Aug. 27, 2014) (when "viewed in their entirety", the allegations in the complaint supported an inference of conspiracy); *In re Southeastern Milk Antitrust Litig.*, 555 F.Supp.2d 934, 943 (E.D. Tenn. 2008) ("While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants . . . a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy.").

Nothing about *Twombly* or *Iqbal* changed this standard. *See, e.g.*, *Wilkinson v. Greater Dayton Reg'l Transit Auth.*, 2012 WL 5879782, at *4 (S.D. Ohio Nov. 21, 2012); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005 (E.D. Mich. 2010) (rejecting argument that *Twombly* required a plaintiff to allege every fact relate to a conspiracy, or that there was a "heightened fact pleading of specifics but only facts necessary to state a claim to relief that is plausible on its face"). Indeed, it is well established that: "Although *Twombly* and *Iqbal* clarified that a complaint must state a plausible claim—not just a possible claim—this Court has cautioned against reading "*Twombly* and *Iqbal* so narrowly as to be the death of notice pleading.'" *Rhodes v. R & L Carriers, Inc.*, 491 F. App'x 579, 583 (6th Cir. 2012) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012), in turn quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012))); *see also, e.g.*, *Southeastern Milk.*, 555 F.Supp.2d at 943 (holding that a complaint need not address all "specific questions about 'who, what, when and where,'" so long as the factual allegations "put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist").

**ARGUMENT**

**V.     Plaintiff's Allegations against Police Defendants are Sufficiently Pled**

The primary grounds on which Police Defendants move to dismiss is that Plaintiff's Amended Complaint contains "group pleading," Dkt. 49-1 at 8,. The Police Defendants also briefly challenge the sufficiency of Plaintiff's conspiracy allegations. These arguments fail for several reasons.

**C. Plaintiff's Allegations Adequately Notify Police Defendants of the Claims Against Them**

Plaintiff's Amended Complaint identifies a limited and well-defined subset of individuals who are alleged to have violated Plaintiff's rights, and it further describes what actions they took. Dkt. 45 ¶¶ 32-42 (Police Defendants investigated Plaintiff and found no evidence implicating him in the crimes); ¶¶ 44-54 (Police Defendants fabricated inculpatory statements from Plaintiff and victim's daughters and hid exculpatory statements from daughters and at least one other witness); ¶¶ 59-76 (Police Defendants conspired with Forensic Defendants to fabricate false forensic evidence to suggest that the rape and murder of Ms. Hudson was not contemporaneous); ¶¶ 43, 82-83 (Police Defendants conspired with Forensic Defendants to suppress their fabrications by hiding or destroying physical evidence and not seek further testing of DNA evidence). That is all that is required at this stage.

Contrary to Defendants' argument that Plaintiff has engaged in impermissible "group pleading" that warrants dismissal, it is well established that a complaint does not fail because it refers to the actions of a small number of Defendants as a group. Thus, Defendants Gunsch, Kunz, Matuszny, Miller, O'Malley, and Zbikowski are not entitled to dismissal merely because the Amended Complaint at times makes the same allegations against each them together. Instead, the core consideration is notice. *Twombly*, 550 U.S. at 554-555. Thus, district courts in this Circuit and elsewhere have repeatedly refused to dismiss complaints for allegedly improper

14

group pleading. *See*, *e.g., Guertin v. Michigan*, 2017 WL 2418007, at *17 (E.D. Mich. June 5, 2017) (denying motion to dismiss for "group pleading" because complaint gave "more than fair notice of the claims against" defendants); *see also In re Duramax Diesel Litig.*, 2018 WL 949856, at *9-10 (E.D. Mich. Feb. 20, 2018) (rejecting argument that complaint alleging wrongdoing by "Bosch Defendants" was impermissible group pleading even though it did not identify "the precise identity of the [Bosch] subsidiary and/or employee which may have taken certain actions" because the complaint "put Bosch Defendants on notice of the claims made against them"); *accord Hebshi v. United States*, 12 F. Supp. 3d 1036, 1046 (E.D. Mich. 2014).

Dismissal for grouping defendants together at the pleading stage is particularly inappropriate because at this stage, a plaintiff has not yet had the benefit of discovery. *See*, *e.g., Horn v. City of Covington*, 2015 WL 4042154, at *6 (E.D. Ky. July 1, 2015) ("At this juncture, Plaintiffs need not make detailed factual allegations about which officer committed which act.... That burden is reserved for later stages of the litigation." ); *Koh v. Graf*, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013) ("Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer.").

This is particularly true in cases like this one, where much of the alleged misconduct happened outside of the plaintiff's direct observation. For example, in *Lyons v. Jacobs*, the court rejected the defendants' "group pleading" challenge on the ground that it was premature, holding that all plaintiffs were required to do at the pleadings stage of an excessive force case was name the officer at the scene, describe the type of force used, and allege that the officers collectively used that force. 2017 WL 4168369, at *6 (S.D. Ohio Sept. 20, 2017).

Just as in *Lyons*, Plaintiff in this case has named the officers involved in the investigation, described the misconduct used to secure his wrongful conviction, and alleged that the Police

Defendants collectively committed that misconduct. Without discovery, it is not reasonable to expect, nor does the law require, Plaintiff to identify every specific action each Police Defendant took. *See, e.g.*, *Berry v. Cahoon*, 731 F. Supp. 2d 685, 687-88 (S.D. Ohio 2010) (rejecting challenge to "group pleading" because "Defendants in this case have been identified and the Plaintiffs are claiming that all the Defendants conspired in committing these violations."); *Bistrian v. Levi*, 696 F.3d 352, 370 (3d Cir. 2012) (permitting "group pleading" and stating "discovery may reveal that some Prison Management Defendants did not know that the lid had been blown off the note sting…At this point, however, we cannot expect clairvoyance from Bistrian."); *Patterson v. Burge*, 328 F. Supp. 3d 878, 887-88 (N.D. Ill. 2004) ("[The plaintiff] specifically names and accuses each of these defendants of committing numerous violations of federal and state law and of conspiring with the other individual defendants to deprive [the plaintiff] of his rights and cause him grievous injuries. Federal notice pleading rules do not require [the plaintiff] to provide detailed explanations of how each particular defendant caused each of his injuries,").

In short, Plaintiff's allegations here, which identify the individual defendants and then consistently discuss different subgroups of defendants are entirely proper and sufficient—Defendants Gunsch, Kunz, Matuszny, Miller, O'Malley, and Zbikowski are on adequate notice of the claims against them. This is all that is required at this early stage of litigation.[1]

---

[1] The cases cited above that discuss "group pleading" are just some examples in a long-line of cases permitting such pleading in constitutional cases and other contexts. *See, e.g.*, *Sanders v. City of Chicago Heights*, 2014 WL5801181, at *3 (N.D. Ill. Nov. 7, 2014) (rejecting defendants' "group pleading" argument because "[u]nder the circumstances, Plaintiff has alleged sufficient details that present a 'story that holds together' in relation to his due process claim and the derivative conspiracy and failure to intervene claims."); *Burgess v. Baltimore Police Dep't*, 2016 WL 795975, at *10 (D. Md. Mar. 1, 2016) ("The use of 'Officer Defendants' is hardly an attempt to shift the burden from Plaintiff to the Officer Defendants regarding what they did or did not do…Instead, the burden remains firmly on the shoulders of Burgess to plead a plausible claim for relief, and then prove that claim through information obtained during discovery. The

**D.  The Complaint's Allegations of Conspiracy Are Sufficient**

Police Defendants also make a brief argument challenging the sufficiency of Plaintiff's conspiracy allegations, but that argument fails. *See* Dkt. 49-1 at 9-10. To survive a motion to dismiss a conspiracy claim, a plaintiff must only plead "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905–06 (6th Cir. 2004).[2] Importantly, as explained above, the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *Continental Ore Company*, 370 U.S. at 699. In addition, courts have recognized that the very nature of some torts such as conspiracy prevents plaintiffs from asserting which of many individual defendants is responsible for particular misconduct. *See*, *e.g.*, *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985) ("The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial. This is particularly true where, as here, much of the information regarding ... the formation of the conspiracy [is] in the hands of the defendant."); *see also Womack v. Conley*, 595 F. App'x 489, 2014 WL 6997493, at *4 (6th Cir. Dec. 11, 2014) ("Because direct evidence of civil conspiracy is often unavailable, it

---

use of "Officer Defendants" thus does not amount insufficient pleading under *Iqbal* and *Twombly*."); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F.Supp.2d 1179, 1184 (N.D. Cal. 2009) (rejecting the defendants' "group pleading" challenge to the amended complaint because the new allegations "more than adequately allege[d] the involvement of each defendant and put defendants on notice of the claims against them").

[2] Any argument regarding the sufficiency of the allegations with respect to any of Plaintiff's other claims is waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

is enough for the plaintiff to plead circumstantial evidence from which the existence of a conspiracy can be reasonably inferred.").

Here, the Amended Complaint's conspiracy allegations readily satisfy Rule 8. Plaintiff has identified the aim of the agreement: to falsely implicate him and secure his conviction for crimes he did not commit. *E.g.*, Dkt. 45, ¶¶ 7, 9, 10, 101, 122, 138-144, 169-174. Plaintiff has identified the co-conspirators: the Police and Forensic Defendants. *E.g.*, *id.* at ¶¶ 11-12. In addition, Plaintiff has identified numerous overt acts taken in furtherance of this conspiracy by the co-conspirators. *See generally id.* at ¶¶ 37-54, 55-83.

In short, because Plaintiff's factual allegations of conspiracy are detailed and specific, and not "vague" or "conclusory," Dkt. 49-1 at 9, Police Defendants may be liable for conspiracy. This argument and provides no basis for dismissal of this or any of Plaintiff's other claims.[3]

## VI. Plaintiff's Claims Against Defendant Estate of Matuszny Should Not Be Dismissed

Defendant Estate of Matuszny separately argues that the claims against him must be dismissed because an estate cannot be sued under Ohio law and the claims against him do not survive his death. Neither of these arguments have merit.

First, although Plaintiff acknowledges that an administrator must be appointed for the Estate of Matuszny in order to sue and effectively serve this Defendant, counsel for the Estate

---

[3] In addition, Police Defendants' premise assumes that they can be liable only for their own actions, but this is not the case. Instead, it is well established that a co-conspirator is liable for actions of his co-conspirators in furtherance of that conspiracy and Police Defendants can be liable as such. *See Hooks*, 771 F.2d at 943- 44; *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990) (noting that "each member of a conspiracy becomes responsible for acts in furtherance of the conspiracy committed by his co-conspirators"); *cf. Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (noting that, "in civil as in criminal law" a conspirator is liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy."); *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d. Cir. 1981) ("A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others.").

has made representations that they are working to identify an administrator and would work with Plaintiff's counsel to prepare a joint stipulation regarding the substitution of an administrator for the Estate in this lawsuit. *See* Dkt. 39 at 3. Counsel gave no indication that they would seek to dismiss claims against the Estate because no representative has been appointed. Given counsel's earlier representations, the Estate should not be permitted to change positions relied on by Plaintiff to his detriment. Such actions would be grounds for this Court to invoke equitable estoppel. *See Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991) (outlining elements of equitable estoppel including conduct or language amounting to a representation of material fact and detrimental and justifiable reliance by the party asserting estoppel on the representation).

Second, Defendant Estate of Matuszny's argument that Plaintiff's claims do not survive Officer's Matuszny's death is incorrect. Under binding Sixth Circuit law, there is no question that the claims survive.

Defendant Estate of Matuszny's reliance on *Tinney v. Richland Cty.*, a district court case holding that § 1983 claims do not survive officer's death, is misplaced. 2014 WL 6896256, at *2 (N.D. Ohio Dec. 8, 2014), aff'd, 678 F. App'x 362 (6th Cir. 2017). *Tinney* was superseded by a published opinion of this Circuit holding precisely the opposite. *Crabbs v. Scott* expressly rejected the holding in *Tinney*, holding instead that § 1983 claims are subject to the procedural rules of the state where they are brought that relate to personal injury actions, regardless of the specific type of injury alleged in the suit. *See* 880 F.3d 292, 296 (6th Cir. 2018).

Recently, the Sixth Circuit held in no uncertain terms:

After *Crabbs*, all claims brought under § 1983 are to be treated as actions sounding in personal injury tort. Because Ohio Revised Code § 2305.21 provides that actions for personal injury survive the deaths of the tortfeasors, and that statute does not conflict with the laws of the United States…§ 1983 actions brought in Ohio survive the deaths of the tortfeasors.

*Jackson v. City of Cleveland*, 920 F.3d 340, 357 (6th Cir. 2019). Accordingly, when the court substitutes a representative for the Defendant Estate of Matuszny, all of the claims against it survive and should proceed to discovery. [4]

### VII.  Plaintiff's *Monell* Claim Against the City of Cleveland is Sufficiently Pled

To survive a motion to dismiss a municipal liability claim, a plaintiff must plead (1) the violation of a federal right, (2) the defendants acted under color of state law, and (3) the municipality's policy or custom caused the violation to occur. *Bright v. Gallia Cty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014). Municipal liability claims need not be pled with particularity. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993).

As an initial matter, in arguing for dismissal of Plaintiff's *Monell* claim, the City only sets forth the law relating to *Monell* claims and then makes a conclusory argument that Plaintiff only alleges a single incident of unconstitutional conduct—his case—and fails to show other instances of the constitutional violations that establish a pattern of misconduct. Dkt. 54 at 4-8. This is plainly incorrect. The Amended Complaint identifies 15 other instances of constitutional violations pursuant to the policies and practices of the City of Cleveland that led to wrongful arrests, prosecutions, and/or convictions. *See* Dkt. 45 at ¶ 120.

In addition to these specific allegations, the Amended Complaint also pleads in ample detail that the specific policies and practices of the Cleveland Police Department to pursue wrongful convictions through fabricating false evidence, withholding exculpatory evidence, and coercing witness testimony that caused Plaintiff's injuries and injuries to over a dozen other individuals. *See id.* at ¶¶ 109-120 (alleging "the policies, practices, and customs of the City of

---

[4] Contrary to Defendants' argument, Dkt. 49-1 at 13, neither *Crabbs* nor *Jackson* distinguished § 1983 malicious prosecution from other types of § 1983 claims, and there is no reason for this Court to do so.

Cleveland with respect to witness interviews, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of its employees and agents" were the moving force behind Plaintiff's and other individuals' constitutional violations). There can be no serious dispute that the City has been put on notice of the claims against it.

Plaintiff will ultimately need to prove municipal liability at trial based on one of the four avenues identified in *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005).  But at this early stage in the litigation, he need only plead the existence of a policy or custom and that the policy or custom caused his injuries, which he has done. Accordingly, the City is not entitled to dismissal of the municipal liability claim. *See, e.g.*, *A.M.S. v. Steele*, 2012 WL 2130971, at *9 (S.D. Ohio June 8, 2012) (rejecting defendants' argument that plaintiffs need to plead specific facts with respect to the allegedly injurious policy in order to state a *Monell* claim, holding that plaintiffs' allegations identifying the policy was sufficient to support their *Monell* claim at the motion to dismiss stage); *Stack v. Karnes*, 750 F.Supp.2d 892, 899 (S.D. Ohio 2010) (finding Plaintiff's sole allegation that "Franklin County has historically implemented a policy or custom of failing to implement adequate training programs" stated a plausible *Monell* claim and therefore denying municipality's motion to dismiss).

### VIII.   The City is not Immune from All of Plaintiff's State Law Claims

Defendant City argues that the Ohio Tort Immunity Act bars all of Plaintiff's state law claims. Plaintiff agrees that, based on existing case law, he cannot proceed directly against the City for state-law claims of malicious prosecution, intentional infliction of emotional distress, conspiracy, and respondeat superior liability.[5]

---

[5] Section 2744.09(E) of the Ohio Political Subdivision Tort Liability Act provides in relevant part that "[t]his chapter does not apply to, and shall not be construed to apply to …

Plaintiff does, however, state a viable indemnification claim against the City. The City's argument that only employees, and not tort claimants such as Plaintiff, can proceed directly against the City for indemnification should be rejected.

Courts in this district have held that, in cases such as this, tort claimants may proceed directly against the municipality on an indemnification claim under Ohio law. In *Vaughan v. City of Shaker Heights*, the plaintiff filed suit against the City of Shaker Heights and one of its detectives for violating his constitutional rights. *Vaughan*, 2011 WL 5966732 (N.D. Ohio Nov. 28, 2011), *aff'd in part, rev'd in part on other grounds*¸ 514 F. App'x 611 (6th Cir. 2013). One of Vaughan's claims was for indemnification against the City, based on its detective's conduct. The City sought to dismiss the indemnification claim, arguing that under § 2744.07(A)(1), only a municipal employee could seek indemnification against its municipal employer. *Vaughan*, 2011 WL 5966732, at *4. But the court in *Vaughan* rejected the City's argument and permitted the plaintiff's indemnification claim to proceed under Ohio R.C. § 2744.07(A)(2). *See id.* at *5. The court reasoned that "[t]he clear statutory terms [of § 2744.07(A)(2)] require the City of Shaker Heights to indemnify Detective Hyams' conduct for compensatory damages if that conduct was carried out in good faith within the scope of his employment." *Id*. On that basis, Mr. Vaughan, as the claimant for those damages, had standing to assert the claim. Plaintiff is in the identical position here and should likewise be allowed to proceed.

---

[c]ivil claims based upon alleged violations of the constitution or statutes of the United States." Ohio R.C. § 2744.09(E). Thus, while the City might enjoy immunity from liability for many of the torts committed by its employees, violations of the United States Constitution are not among them. *See Chaney v. Norwood*, 2010-Ohio-3434, ¶¶ 7-9, 937 N.E.2d 634, 636 (Chapter 2744 did not protect the City of Norwood from liability for claims under 42 U.S.C. § 1983 brought on the basis of actions by its employees); *Longstreth v. Franklin County Children Servs.*, 14 F.3d 601 (6th Cir. 1993) ("By its express terms, the Ohio Political Subdivision Tort Liability Act, Ohio Rev. Code § 2744.01, *et seq.*, does not bar actions brought under federal civil rights laws."); *Wohl v. Cleveland Bd. of Educ.*, 741 F. Supp. 688, 691 (N.D. Ohio June 15, 1990).

Similarly, in *Ayers v. City of Cleveland*, 2013 WL 775359, at *16 (N.D. Ohio Feb. 25, 2013), Judge Gwin rejected the City of Cleveland's argument at summary judgment that Ayers could not maintain a cause of action for indemnification against the City. The court held:

> Requiring a political subdivision to indemnify its employee is different than imposing direct liability. The statutory text requires the City of Cleveland to indemnify Detective Cipo and Kovack if the conduct was carried out in good faith and within the scope of their employment. The Court rejects the notion that only Detectives Cipo and Kovach as employees can assert a claim for indemnification. To hold otherwise would defeat the statute['s] purposes of sparing municipal employees from having to pay a judgment prior to indemnification and to ensure members of the public harmed by municipal employees are made whole.

*Ayers*, 2014 WL 2042254, at *2 (citing *Vaughan* and *City of Memphis v. Roberts*, 528 S.W.2d 201 (Tenn. 1975) (holding that a similar statute permitted a judgment creditor to obtain indemnification directly from a city)). There, Judge Gwin simply concluded that the indemnification claim was not yet ripe at summary judgment, and dismissed it without prejudice for that reason alone. *Id.*[6]

Allowing tort claimants such as Plaintiff to proceed directly against the County on an indemnification claim is consistent with the purposes of Ohio's indemnification statute: providing an employment benefit to municipal employees and providing "a form of public insurance." *See City of Memphis v. Roberts*, 528 S.W.2d 201, 205 (Tenn. 1975) (construing a similarly-worded state statute). The Ohio legislature's intent in enacting Section 2744.07(A)(2) was to permit judgment creditors to proceed directly against a municipality to recover indemnification proceeds. *See*, *e.g.*, *Vaughan*, 2011 WL 5966732, at *4; *Paolisso v. Edison Local Bd. of Educ.*, 1992 WL 19829, at *1 (Ohio App. Ct. Feb. 5, 1992) (permitting the entry of a judgment directly against a school district solely on the basis of the district's obligation to

---

[6] In a subsequent order, Judge Gwin declined to exercise supplemental jurisdiction over the state-law indemnification claim because the litigation over the federal claims had ended. *Ayers v. City of Cleveland*, 2014 WL 3449419, at *1-2 (N.D. Ohio July 11, 2014).

indemnify its employee pursuant to § 2744.07); *Dixon v. Holden*, 923 S.W.2d 370 (Mo. App. Ct. 1996) (holding that a similar statute permitted a judgment creditor to obtain satisfaction of a judgment directly from a state indemnity fund).

Permitting such recovery serves the statute's employee benefit purpose by sparing municipal employees the often-prohibitive difficulty of having to pay a judgment prior to receiving indemnification proceeds. In *Dixon*, for example, the court explained that the state legislature did not intend to force government employees to deplete their savings, sell their homes, or have their wages garnished prior to receiving indemnification. 923 S.W.2d at 378 (reasoning that "[i]f it is the true intent of this statute to protect state employees as much as possible from the rigors of defending lawsuits borne out of state duties, then it defeats that purpose to have the employee pay from his or her pocket, or from the estate's assets, before being made whole."). Likewise, in *Roberts*, the court explained:

> We recoil at any suggestion that a policeman or fireman, or any other wage-earner during this era of inflation is required to submit to the hurt, humiliation and financial detriment of having his wages garnisheed, or of having to deplete his meager savings, or perhaps of having to sell his equity in his home in order to pay a judgment against him, and then, but only then, recover the money so paid. We cannot believe the Legislature intended any such absurd result.

528 S.W.2d at 205. A contrary construction of section 2744.07 would subject municipal employees across the state to unwarranted burdens upon the entry of a judgment against them.

A construction of Section 2744.07 that permits Plaintiff to invoke a municipality's indemnification obligation serves the statute's secondary purpose of ensuring that members of the public harmed by municipal employees' tortious conduct will be made whole. *See Roberts*, 528 S.W.3d at 203. Here, unless Plaintiff is permitted to seek indemnification directly against the City of Cleveland, he may be unable to recover any of the damages from any judgment eventually awarded to compensate him for the extreme hardship he suffered as a result of the Police Defendants' misconduct.

24

In sum, Plaintiff's indemnification claim is entirely proper and should remain part of this case. At most, the claim could be dismissed only without prejudice, if the Court considers the claim premature because no judgment has yet been entered. *See*, *e.g.*, *Stengel v. Columbus*, 600 N.E.2d 248, 251 ("plaintiff's claim for indemnity under R.C. 2744.07(A)(2) accrued … when the federal court judgment rendered against [the police officer] became final").

## CONCLUSION

Mr. King's wrongful conviction was a miscarriage of justice, in which the City and Police Defendants played a large part. The Amended Complaint alleges "sufficient factual matter" that, when "accepted as true … 'state[s] a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). Accordingly, because there is "more than a sheer possibility" that the City and Police Defendants have "acted unlawfully," *id.*, their motions must be denied.

In the event that the Court were to find that any of Plaintiff's claims are insufficiently pled, Plaintiff respectfully seeks leave to amend the complaint.

RESPECTFULLY SUBMITTED,

/s/ Danielle Hamilton
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Danielle Hamilton
Mark Loevy-Reyes
LOEVY & LOEVY
311 North Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Danielle Hamilton, certify that the foregoing motion was sent via CM/ECF to all counsel of record.

/s/ Danielle Hamilton
*One of Plaintiff's Attorneys*

26